J-S24019-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| SOPHIA L. SHAW | |
| Appellant | No. 1181 EDA 2019 |

Appeal from the Judgment of Sentence Entered March 5, 2019
In the Court of Common Pleas of Montgomery County
Criminal Division at No.: CP-46-CR-0003996-2017

BEFORE:  BENDER, P.J.E., STABILE, J., and STRASSBURGER, J.[*]

MEMORANDUM  BY  STABILE, J.:                          **FILED:  May 10, 2021**

Appellant Sophia L. Shaw appeals from the March 5, 2019 judgment of sentence entered in the Court of Common Pleas of Montgomery County ("trial court"), following her jury convictions for aggravated assault, resisting arrest, three counts of recklessly endangering another person ("REAP"), attempted theft by deception, and disorderly conduct.[1]  Upon review, we affirm.

The facts and procedural history of this case are undisputed.  As summarized by the trial court:

> On June 2, 2017, [Appellant] attempted to flee the police after she got caught trying to falsify a merchandise return at the HomeGoods retail store at 1301 Skippack Pike, Whitpain Township, Montgomery County.  [Specifically, i]n the late afternoon of June 2, 2017, Alan Foyle, Jr., the Loss Prevention

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2702(a)(2), 5104, 2705, 901(a), 3922(a), and 5503(a)(4), respectively.

Training Specialist for the HomeGoods, observed [Appellant] returning high-priced [(approximately $700.00)] merchandise without a receipt to obtain a gift card for the value of the returned merchandise. After [Appellant] completed the initial transaction, she stayed in the HomeGoods store and selected merchandise and presented that merchandise [(valued at approximately $500.00)] for return without a receipt. Once this transaction was completed and [Appellant] received a gift card for the [($500.00)] merchandise she was confronted by Mr. Foyle. Mr. Foyle confiscated the gift card and [Appellant's] I.D. that she had provided to obtain the gift card. [Appellant] abruptly exited the store and went to her car with Mr. Foyle following behind her. Then Mr. Foyle witnessed [Appellant] place what appeared to be a maxi pad over the license plate to her vehicle. [Appellant] then drove to one of the exits from the parking lot of the shopping center. Because of the heavy traffic on Route 73, [Appellant] was unable to exit the shopping center quickly. [Appellant] drove her vehicle back into the parking lot and went back into the HomeGoods store, thinking that she had left her cell phone at the store. [Appellant] asked Mr. Foyle for her cellphone and he advised her that he did not have her cell phone. At this point the police arrived on the scene.

At or about 4:22 pm on June 2, 2017, Whitpain Township Officers Steve Nickel, Brian Richard and Brian Wilfong attempted to apprehend [Appellant] in the parking lot immediately in front of the HomeGoods store. When she returned into the HomeGoods store, [Appellant] left the engine to her vehicle running. So when the Whitpain police attempted to apprehend [her], unbeknownst to them, the engine to [Appellant's] vehicle was running. Despite multiple commands to stop by Officer Nickel, [Appellant] ran to her Chrysler van. Officers Nickel and Wilfong were at the driver's door of the vehicle and Officer Richard was at the passenger side attempting to push [Appellant] out of the driver's door. As [Appellant] entered her vehicle, she pressed the gas pedal, putting Officers Nickel, Wilfong and Richard at risk of injury as they clung to her and her van. Despite commands to stop and get out of the vehicle, [Appellant], who was committed to fleeing the scene and escaping responsibility for her actions, engaged in activity that put the police officers at risk of serious bodily injury. Officer Wilfong injured his back as he was thrown backwards by the vehicle's movement, while two other officers, Nickel and Richard, were trying to stop [Appellant] and hanging on to either

[Appellant] or her vehicle. [Appellant] again accelerated and tried to escape.

Additional police vehicles arrived in the parking lot and were positioned so as to block [Appellant] from driving away from the scene. However, [Appellant] persisted, as she turned the wheel and accelerated. The efforts of Officers Nickel, Richard and Wilfong led to [Appellant's] apprehension and prevented [her] from further endangering innocent civilians who were out that evening.

One of the police vehicles, operated by Officer Wilfong, at the scene of the parking lot was equipped with a dashcam, a camera on the dashboard of the vehicle that allowed the events to be recorded on video which was played back during the trial. Nothing was left to the imagination of the jury; the dashcam video footage showed the actions taken by [Appellant] to attempt to escape the scene in her vehicle. After [Appellant] was apprehended by the police officers, her car was confiscated and searched. At trial, the Commonwealth and [Appellant] entered into a stipulation that upon searching [Appellant's] vehicle, the police discovered a booster bag in the rear of the vehicle. A booster bag is a device, with tinfoil lined on the inside of the bag, designed to defeat the sensors at retail stores.

Sentencing was held on March 5, 2019. During the sentencing, [Appellant's] attorney challenged the computation of her prior record score, and the trial court ultimately decided that [Appellant's] prior record score was a four (4) instead of the originally computed five (5) indicated in the guideline sentence forms for each offense for which [Appellant] was found guilty by the jury. The trial court referenced the report of the pre-sentence investigation as well as the probation and parole intervention evaluation that were ordered at the conclusion of the trial on August 7, 2018.

On the aggravated assault conviction involving serious bodily injury to a police officer, [Appellant] was sentenced to not less than seven and one half (7½) years nor more than fifteen (15) years; the minimum representing an aggravated sentence under 204 Pa. Code 303.12(a)(1) based on information adduced during the sentencing proceedings, the content of the pre-sentence investigation report, the probation and parole intervention evaluation and the circumstances surrounding the criminal episode of June 2, 2017. Restitution in the amount of

- 3 -

$134,208.41 was also ordered. [Appellant] was sentenced to six (6) to eighteen (18) months on two (2) of the recklessly endangering another person offenses, running concurrent to the sentence on the aggravated assault conviction. On the convictions for resisting arrest, disorderly conduct, and attempted theft by deception,[FN1] stemming from events occurring inside the HomeGoods store and on the pavement abutting the front of the store as well as the parking lot when [Appellant] eluded Officer Nickel, [she] was sentenced to not less than three (3) months nor more than six (6) months. This portion of the sentence was to run consecutive to the sentence imposed on the aggravated assault conviction.

> [FN1: By order of May 14, 2019, upon agreement of the Commonwealth and [Appellant], the [s]entence entered on March 5, 2019 was amended to reflect that Count 11 was amended to criminal attempt to commit theft by deception.]

On March 13, 2019, [Appellant] filed a [m]otion for [r]econsideration of the [s]entence, which was denied by order of March 22, 2019. [Appellant] filed her [n]otice of [a]ppeal on April 17, 2019.

Trial Court Opinion, 7/18/19, at 1-4. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant presents three issues for our review.

[I.] Was the evidence sufficient to find the requisite intent for aggravated assault where, *inter alia*, the Appellant's vehicle only moved three to five feet before she braked and the resulting injury was, according to the prosecution, "surprising"?

[II.] Did the lower court err by issuing a sentencing in the aggravated range based solely on the nature and circumstances of the crime, without any discussion of circumstances that deviate from those typical of the charge, where the nature of the crime is incorporated into the Offense Gravity Score, the circumstances of the crime form the elements of the resisting arrest conviction, and substantial mitigating factors are present?

[III.] Did the lower court err by imposing costs on an indigent defendant absent consideration of how the imposition would affect

her restitution obligations and absent a determination of her ability to pay?

Appellant's Brief at viii. We address them in turn.

First, Appellant argues that the evidence presented at trial was insufficient only to establish the *mens rea* requirement of recklessness relating to her conviction for aggravated assault.[2] *Id.* at 8. She claims that she could not have foreseen that Officer Wilfong would suffer a "life-threatening injury" and that the injury was simply a surprise. *Id.* at 10. Appellant points out that, [h]er lucidity and whether she even saw Officer [] Wilfong, who was gripping on the side of the car **behind** the driver seat, are in question." *Id.* at 11 (sic) (emphasis in original). She reasons that she used the brakes and that her car moved "no more than five feet." *Id.* Additionally, Appellant notes that, during the incident, she "was so petrified that she defecated and urinated on herself, [and] absolutely could not have harbored the reckless intent to produce a certain, life-threatening injury." *Id.* at 10.

A claim challenging the sufficiency of the evidence is a question of law." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000).

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by

---

[2] In connection with her sufficiency claim, Appellant challenges only the *mens rea* requirement of aggravated assault and thus concedes readily that she caused serious bodily injury to Officer Wilfong. *See* Appellant's Brief at 8.

the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa. Super. 2014), *appeal denied*, 95 A.3d 275 (Pa. 2014).

Section 2702 of the Crimes Code, relating to aggravated assault, provides in pertinent part:

> **(a) Offense defined.--**A person is guilty of aggravated assault if he:
>
> . . . .
>
> (2) attempts to cause or intentionally, knowingly or **recklessly causes** serious bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c) or to an employee of an agency, company or other entity engaged in public transportation, while in the performance of duty[.]

18 Pa.C.S.A. § 2702(a)(2) (emphasis added). Officers, as enumerated under subsection (c), include police officers. *See* 18 Pa.C.S.A. § 2702(c). Here, as emphasized above, Appellant challenges only the *mens rea* of recklessness. A person acts "recklessly" with respect to a material element of an offense

> when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the

- 6 -

standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(3). Moreover, recklessness "implicates knowledge in two ways: (1) the actor must consciously (*i.e.*, with knowledge) disregard a substantial and unjustifiable risk; and (2) the risk that the actor disregards is measured by the circumstances known to the actor." ***Commonwealth v. Sittler***, 144 A.3d 156, 164 (Pa. Super. 2016). "Conscious disregard" of a risk, in turn, "involves first becoming aware of the risk and then choosing to proceed in spite of the risk." ***Commonwealth v. Huggins***, 836 A.2d 862, 865 (Pa. 2003); ***see also Commonwealth v. Vogelsong***, 90 A.3d 717, 719 (Pa. Super. 2014) (recklessness requires conscious action or inaction that creates substantial risk of harm to others, whereas negligence suggests unconscious inadvertence).

Here, at trial, the Commonwealth called to the stand Officer Stephen Nickel, Jr., an eighteen-year veteran of the Whitpain Township Police Department. Officer Nickel testified that, on June 2, 2017, at approximately 4:20 p.m., he responded to a call regarding a theft at the HomeGoods store in Whitpain Township. N.T. Trial, 8/7/18, at 77-78. At the time, Officer Nickel was attired in full uniform and driving a marked police sport utility vehicle. *Id.* at 78-79. Officer Nickel recalled that, when he reached the HomeGoods store, he observed Appellant loudly arguing with Alan Foyle, Jr., the store's loss prevention training specialist, in the parking lot. *Id.* at 43, 80. Mr. Foyle and Appellant were standing at least five to ten feet away from each other. *Id.* at 80. According to Officer Nickel, when he approached Appellant, she

- 7 -

started "to, like, backpedal a little bit, and she was saying things like everything is okay here, I just want my phone. That was the main theme, that she just wanted her phone and she just wanted to leave." *Id.* at 81. Officer Nickel testified that Appellant had no interest in going inside the store to "straighten" out the situation. *Id.* at 81-82. When asked whether Appellant backpedaled all the way to her minivan, Officer Nickel responded:

> Maybe backpedaled five steps, and then turned her body and started walking quickly, and then I realized, okay, and then I stepped it up to a jog. Not really closing in on her, though, you know, remaining at – well, I was closing the distance slightly and not realizing that her car was in pretty close proximity to her.
>
> . . . .
>
> So it turned into a full out run, then, for the last, maybe, another ten, fifteen yards. From what I recall, she might have been fifteen – roughly fifteen parking spots parked back from HomeGoods, if you go out. And the full sprint happened for, like, the last, you know, very brief period. And she ran around the front of the van – unbeknownst to me it was hers – and hopped in the driver's side. She had to open up the driver's side and hop into the driver's seat.

*Id.* at 82-83. Again, Officer Nickel testified that, when Appellant started to walk away from him, he had no idea what vehicle belonged to her or whether the vehicle was running. *Id.* at 83. He recalled that no one else was present in the van. *Id.* Officer Nickel could not recall whether Appellant put on her seatbelt when she hopped into the van. *Id.*

Describing the moments immediately prior to Appellant's entering the van, Officer Nickel testified:

By that time, I was right with her. The door – when she opened the door, that sort of blocked me from her because the angle, I came around. So she got to the driver's seat as I was trying to maneuver, then, with my speed. I kind of bounced off the door and went around the door. And by the time, I got in the door jam with her, she was fully seated in the van, and that's when I realized that the van had already been running.

*Id.* at 84. "Throughout that entire time I was saying, ma'am, stop; ma'am, please stop; ma'am, stop[.]" *Id.* At that point, according to Officer Nickel, two other officers just pulled up. *Id.* Specifically, he testified:

If her van was parked in a parking spot, there was no one behind her and two cop cars came in from, say, 7:00 o'clock and 4:00 o'clock, on each side of her from what I would've recalled, like, they may have just been pulling up as I was entering the door jam.

*Id.* Officer Nickel recalled that Appellant's "fear was so elevated" that "it appeared to me, like, that she was going to stop at no cost to get away." *Id.* at 85. As a result, Officer Nickel stated that he "needed to go hands on and remove her from the vehicle." *Id.*

Recounting his attempts to remove Appellant from the van, Officer Nickel testified:

She was locked onto the steering wheel, and I was trying to, like, pry her hands off the steering wheel, and I just couldn't do it, and it was just a lot of chaos. And at that point the car must have already been in drive,[3] because her hands, from what I remember, were locked on the steering wheel. And my thought was to get her hands off the steering wheel, and then she'll come out of the car much easier. And that struggle – I remember

_____

3 Officer Nickel clarified that Appellant put the minivan in drive. N.T. Trial, 8/7/18, at 90.

- 9 -

thinking, you know, I'm not getting her hands off the steering wheel.

*Id.* Officer Nickel further testified that his feet were on the pavement and that only his arms were inside the van. *Id.* at 86. As Officer Nickel was attempting to remove Appellant from the van, the van "lunged forward as if it was accelerated." *Id.* "I remember hearing wheel screech, screech, like you would hear a burnout." *Id.* at 86. Officer Nickel testified:

> And crazy timing, my supervisor happened to be just pulling up at that point, and you'll see on video that that's the reason that she slammed on her brakes, because she was either going to slam right into that cop car to avoid probably crashing into the cop car – that would have immobilized her van. She sort of slammed on her brakes and turned to the left, and that's, like, when we all lunged forward, lunged back the first time.

*Id.* at 86-87 (sic). At that point, Officer Nickel was holding onto Appellant. *Id.* at 87. When Appellant accelerated the first time, Officer Nickel "sort of got drug along with the [van] for a few – a parking lot – a parking space length." *Id.* at 88. He testified that the van moved a total of "no more than two [van] lengths." *Id.*

Officer Nickel further testified that Appellant accelerated the van again when she turned to the left after avoiding a collision with his supervisor's vehicle. *Id.* at 89. At all times, the driver's side door was open, with Officer Nickel holding on to Appellant. *Id.* 87-89. According to Officer Nickel, his colleague, Officer Brian Richard, saved him from possibly getting drug under the van. *Id.* at 89.

> He was able – unbeknownst to me he showed up, you know, out of the blue and appeared in the van [through the passenger side

- 10 -

front door]. And from what I recall, that was the final stopping of the van. We were accelerating again, and Brian Richard was finally able to find where park was, get it in park, and that slammed the van, you know, stopped the van's momentum, and that's where the van rested then, once he got it in park.

*Id.* 89-90. Officer Nickel recalled seeing Officer Richard with his knees on the passenger seat when Officer Richard put the minivan in park. *Id.* at 90. He testified that Officer Richard did not accelerate the vehicle. *Id.* at 91.

Officer Nickel testified that a third police officer, Officer Brian Wilfong, also assisted during this incident. *Id.* He stated that Officer Wilfong was positioned over his back right shoulder. *Id.* Officer Nickel recalled that Officer Wilfong helped him pull Appellant out of the van, while Officer Richard pushed her from the inside. *Id.* at 92. Officer Nickel suffered small lacerations on his arm during this incident. *Id.* at 93. Officer Nickel recalled that the incident happened around 4:30 on a Friday afternoon during the "busiest time of the week" when there is a lot of vehicular and pedestrian traffic. *Id.* at 87.

The Commonwealth next called to the stand Officer Richard, a thirteen-year veteran of the Whitpain Police Department. *Id.* at 121. He testified that when he reached the HomeGoods parking lot, he observed Officer Nickel chasing Appellant "around the front of a car." *Id.* Officer Richard proceeded to the passenger side of the van. *Id.* at 122. At the time, according to Officer Richard, he heard Officer Nickel "giving commands to stop, to get out of the car" and Appellant yelling "I just want my phone." *Id.* Officer Richard testified that the minivan was stationary when he first approached it. *Id.* But it did not "stay that way." *Id.* Officer Richard testified that he decided to enter the

van to physically push Appellant out. *Id.* at 123-24. He further testified that, when he was entering the van from the passenger side, it began moving forward. *Id.* at 123. Describing the acceleration, he stated:

> Once it started to lurch forward, I'm not sure if it was the first time or the second time when we turned left. I felt as though I was going to fall back out of the vehicle, and I braced myself against either the post of the windshield or the door or the dash, I'm not really sure.

*Id.* at 124. At that point, the upper half of his body was inside the van. *Id.* at 123. He eventually located the shifter and put the van in park, with the passenger side door open and his knees on the seat and legs sticking out. *Id.* at 128-29. Officer Richard testified that he suffered a "deep bruise on [his] forearm and some abrasions in that area." *Id.* at 124.

Next, Officer Wilfong, a nineteen-year veteran of the Whitpain Police Department, testified that he responded to the incident at the HomeGoods store on June 2, 2017 in a fully marked Expedition. *Id.* at 139. Upon arriving, Officer Wilfong immediately turned his attention to assisting Officer Nickel who was holding open the door to the minivan. *Id.* at 142. He testified that Officer Nickel was situated against the A pillar – "the piece of metal that goes down between the windshield and the front driver door." *Id.* at 142-43. Officer Wilfong testified that he "wedged himself between the B pillar," which "divides car between the driver door and the rear driver door." *Id.* at 143. Officer Wilfong recalled that he put his left arm in and grabbed a hold of Appellant's sleeves. *Id.* "I had a pretty good hold of it, and I was trying to pull her out

and push with all my body weight.  She was in there pretty good.  She didn't want to come out at all." ***Id.***

He further recalled:

I remember just having a hold of her and all of the sudden, feeling pressure from Officer Nickel's body hitting me, and then I was kind of spit out, out of control.  I caught myself and I felt, like, a shock of pain that went all the way down my right side of my body to my foot.  I didn't know what had happened there.  I was actually – I grabbed it, but we're in a heat of getting an arrest done.  I looked at myself real quick.  I felt I still had my firearm and everything and I needed to get back in to assist, because the situation wasn't done.  So I have this pain running down my leg, and I go to look at Officer Nickel, who still has control or is still battling with [Appellant] to pull her out of the vehicle, and I see the vehicle lurched forward again and to the left with the door open.  And then there's just a screech and a stop.  And I pull my taser out, I don't know if we're going to have to taser her inside the vehicle to get her out of there, because she does not want to come.  We pull her out.  Actually, I believe it was Brian Richard who assisted.  I didn't actually pull her out.  She started coming out by the time I got back.  I had my taser out.  She was completely uncooperative.  And we were able to get her in handcuffs, and she had some other issues going on.  She had defecated and urinated on herself at the time.

***Id.*** at 144-45.  Describing his pain, Officer Wilfong testified "[i]t was a sudden burning pain.  I would imagine if you broke a bone or something like that or stubbed your toe really hard.  That went down from the lower portion of my back through my leg, all the way to my foot." ***Id.*** at 145-46.  According to Officer Wilfong, he felt the pain when he caught himself after the van "lurched forward," and he "was spit out" and "thrown back." ***Id.*** at 146.  Officer Wilfong testified that he eventually was diagnosed with "two herniated discs and a bulging disc" and underwent surgery. ***Id.*** at 148-50.  He further testified that

he continues to suffer pain and has not yet returned to work. *Id.* at 154-55. "[E]very aspect of his daily life is affected" and he has "not had a pain-free day since the incident." *Id.* at 155.

Based on our review of the record, as detailed above, we agree with the trial court's conclusion that, viewed in a light most favorable to the Commonwealth, the evidence establishes that the Commonwealth proved beyond a reasonable doubt that Appellant was guilty of aggravated assault. She recklessly caused serious bodily injury to Officer Wilfong. As the evidence at trial demonstrated, Appellant endangered the lives of three police officers. She rushed into her running vehicle with Officer Nickel closely behind her. She then put her vehicle in drive in an attempt to flee the scene while the officers were grabbing onto her and/or hanging out of her vehicle's doors. In that time, she twice accelerated the vehicle. Thus, she consciously disregarded a substantial and unjustifiable risk of injury to the officers. Accordingly, Appellant is not entitled to relief.[4]

_____

[4] Appellant invites us to accept her proffered version of the facts, re-weigh the evidence and substitute our judgment for that of the fact-finder. We decline the invitation. It is settled that we may not substitute our judgment for that of the factfinder—whether a jury or the trial court—because it is the province of the factfinder to assess the credibility of the witnesses and evidence. *See Commonwealth v. DeJesus*, 860 A.2d 102, 107 (Pa. 2004); *Commonwealth v. Johnson*, 668 A.2d 97, 101 (Pa. 1995) ("an appellate court is barred from substituting its judgment for that of the finder of fact."); *Commonwealth v. Forbes*, 867 A.2d 1268, 1273 (Pa. Super. 2005) (stating that "[t]he weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, part, or none of the evidence and to determine the credibility of witnesses. An appellate court cannot substitute its judgment for that for the finder of fact.").

We next address Appellant's second issue, which implicates the discretionary aspects of her sentence. She argues that the trial court abused its discretion in "double counting" the severity and nature of the crime in imposing upon her an aggravated-range sentence for aggravated assault. Appellant's Brief at 12. Additionally, Appellant argues that the trial court "double-counted the elements of the resisting arrest charge when imposing the sentence by using the crime of resisting arrest as the justification for the aggravated sentence on the aggravated assault charge." *Id.* Finally, she claims that the trial court failed to adequately consider mitigating factors that would have favored a standard-range sentence. *Id.*

It is well-settled that "[t]he right to appeal a discretionary aspect of sentence is not absolute." *Commonwealth v. Dunphy*, 20 A.3d 1215, 1220 (Pa. Super. 2011). Rather, where an appellant challenges the discretionary aspects of a sentence, an appellant's appeal should be considered as a petition for allowance of appeal. *Commonwealth v. W.H.M.*, 932 A.2d 155, 162 (Pa. Super. 2007). As we stated in *Commonwealth v. Moury*, 992 A.2d 162 (Pa. Super. 2010):

> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:
>
> > [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed

- 15 -

> from is not appropriate under the Sentencing Code, 42
> Pa.C.S.A. § 9781(b).

*Id.* at 170 (citing *Commonwealth v. Evans*, 901 A.2d 528 (Pa. Super. 2006)). Whether a particular issue constitutes a substantial question about the appropriateness of sentence is a question to be evaluated on a case-by-case basis. *See Commonwealth v. Kenner*, 784 A.2d 808, 811 (Pa. Super. 2001), *appeal denied*, 796 A.2d 979 (Pa. 2002).

Here, Appellant has satisfied the first three requirements of the four-part *Moury* test. Appellant filed a timely appeal to this Court, preserved the issue on appeal through her post-sentence motions, and included a Pa.R.A.P. 2119(f) statement in her brief.[5] We, therefore, must determine only if her sentencing issues raise a substantial question.

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. *Commonwealth v. Paul*, 925 A.2d 825, 828 (Pa. Super. 2007). We have found that a substantial question exists "when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Phillips*, 946 A.2d 103, 112

---

[5] Rule 2119(f) provides that "[a]n appellant who challenges the discretionary aspects of a sentence in a criminal matter shall set forth in her brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence." Pa.R.A.P. 2119(f).

(Pa. Super. 2008) (citation omitted), *appeal denied*, 964 A.2d 895 (Pa. 2009).

Here, Appellant has a raised a substantial question with respect to her discretionary aspects of sentence claims involving double counting. *See Commonwealth v. Bowen*, 975 A.2d 1120, 1120 (Pa. Super. 2009) (noting that a defendant's argument that his sentence "was based on an unconstitutional factor . . . raises a substantial question for our review"); *Commonwealth v. Goggins*, 748 A.2d 721, 728 (Pa. Super. 2000) (*en banc*) (stating that double counting a defendant's prior record score raises a substantial question), *appeal denied*, 759 A .2d 920 (Pa. 2000); *Commonwealth v. Robinson*, 931 A.2d 15, 27 (Pa. Super. 2007) (a claim that the trial court impermissibly double-counted factors already incorporated in the sentencing guidelines raises a substantial question); *Commonwealth v. McNabb*, 819 A.2d 54, 56–57 (Pa. Super. 2003) (a claim that the trial court relied on impermissible factors raises a substantial question); *Commonwealth v. Fullin*, 892 A.2d 843, 848 (Pa. Super. 2006) (concluding appellant raised substantial question where he argued "that the trial court improperly based [appellant's] aggravated range sentence on a factor that constituted an element of the offense"). Accordingly, we will address the merits of Appellant's sentencing claims.

When reviewing a challenge to the trial court's discretion, our standard of review is as follows:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will.

*Commonwealth v. Bowen*, 55 A.3d 1254, 1263 (Pa. Super. 2012) (quoting *Commonwealth v. Cunningham*, 805 A.2d 566, 575 (Pa. Super. 2002)), *appeal denied*, 64 A.3d 630 (Pa. 2013).

We first address Appellant's argument that the trial court abused its discretion in double counting the severity and nature of the crime, which is included in the offense gravity score, in sentencing her to 7½ to 15 years' imprisonment for aggravated assault. Appellant's Brief at 12.

Generally, "[i]t is impermissible for a court to consider factors already included within the sentencing guidelines as the *sole* reason for increasing or decreasing a sentence to the aggravated or mitigating range." *Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa. Super. 2006) (emphasis in original). Additionally, "[t]rial courts are permitted to use factors "already included in the guidelines if they are used to supplement other extraneous sentencing information." *Id.* When deciding whether a court has improperly based an aggravated sentence on a factor that is already considered by the sentencing guidelines, we have stated:

[T]he guidelines were implemented to create greater consistency and rationality in sentencing. The guidelines accomplish the above purposes by providing a norm for comparison, *i.e.*, the standard range of punishment, for the panoply of crimes found in the crimes code and by providing a scale of progressively greater

punishment as the gravity of the offense increases. . . . The provision of a "norm" also strongly implies that deviation from the norm should be correlated with facts about the crime that also deviate from the norm for the offense, or facts relating to the offender's character or criminal history that deviates from the norm and must be regarded as not within the guidelines contemplation. Given this predicate, simply indicating that an offense is a serious, heinous or grave offense misplaces the proper focus. The focus should not be upon the seriousness, heinousness or egregiousness of the offense generally speaking, but, rather, upon how the present case deviates from what might be regarded as a "typical" or "normal" case of the offense under consideration.

*Fullin*, 892 A.2d at 848 (citation omitted). Moreover, "[a]n aggravated range sentence [is] justified to the extent that the individual circumstances of [the defendant's] case are atypical of the crime for which [the defendant] was convicted, such that a more severe punishment is appropriate." *Id.* The *Fullin* Court affirmed an aggravated range sentence because the trial court justified the sentence by opining on "the extreme indifference for the consequences of [the defendant's] actions and because of the extreme nature of the harm to the victim." *Id.* at 849 (citation omitted).

Here, the trial court intimated that the circumstances of this case, especially Appellant's actions during the incident, were atypical, warranting an aggravated-range sentence. *See* N.T. Sentencing, 3/5/19, at 77. The court pointed out that Appellant attempted to flee the scene while three officers were either hanging onto her and/or the minivan and accelerated twice in the process. *Id.* Although all three officers sustained injuries, it was Officer Wilfong who suffered serious bodily harm. The court did not aggravate Appellant's sentence because she harmed Officer Wilfong, but rather because

she **accelerated her vehicle twice**, resulting in harm to **two other officers**. This atypical circumstance is not accounted for in the charged crime (aggravated assault), which at the core requires only that Appellant recklessly cause serious bodily injury to a police officer—here Officer Wilfong. Accordingly, we cannot conclude that the trial court abused its discretion in imposing an aggravated-range sentence.

Next, Appellant argues that the trial court abused its discretion in aggravating her sentence for aggravated assault by considering the elements of resisting arrest, a separate crime.[6] We, however, need not address this argument. Even if the court abused its discretion, Appellant would not obtain relief, given the court's use of other permissible factors identified above. *See Bowen*, 975 A.2d at 1127 (noting that, despite relying on an impermissible factor, the trial court evaluated several permissible factors in imposing an aggravated-range sentence); *Commonwealth v. P.L.S.*, 894 A.2d 120, 133 (Pa. Super. 2006) (finding that even if the trial court considered an inappropriate factor at sentencing, "the court offered significant other support for sentencing in excess of the guidelines in this case"), *appeal denied*, 906 A.2d 542 (Pa. 2006).

To the extent Appellant claims that the trial court did not adequately consider mitigating factors, she fails to raise a substantial question. We have

---

[6] We observe that aggravated assault and resisting arrest do not merge for sentencing purposes, as both crimes require proof of at least one element that the other does not have. *See Commonwealth v. Williams*, 496 A.2d 31, 38 (Pa. Super. 1985) (*en banc*).

"held on numerous occasions that a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review." ***Commonwealth v. Disalvo***, 70 A.3d 900, 903 (Pa. Super. 2013) (quoting ***Commonwealth v. Downing***, 990 A.2d 788, 794 (Pa. Super. 2010)); ***see also Commonwealth v. Berry***, 785 A.2d 994 (Pa. Super. 2001) (explaining allegation that sentencing court failed to consider certain mitigating factor generally does not raise a substantial question); ***Commonwealth v. Cruz-Centeno***, 668 A.2d 536, 545 (Pa. Super. 1995) ("[a]n allegation that a sentencing [judge] 'failed to consider' or 'did not adequately consider' certain factors does not raise a substantial question that the sentence was inappropriate,"), ***appeal denied***, 676 A.2d 1195 (Pa. 1996); ***Commonwealth v. Bershad***, 693 A.2d 1303, 1309 (Pa. Super. 1997) (finding absence of substantial question where appellant argued the trial court failed to adequately consider mitigating factors and to impose an individualized sentence). Even if we were to find a substantial question, we still would conclude Appellant is not entitled to relief. Where, as here, the sentencing court had the benefit of a presentence investigation report, ***see*** N.T. Sentencing, 3/5/19, at 72, 76 ("I've considered your age, the information about yourself that has been given to me, your testimony, the information set forth in the presentence investigation report, and also in the probation and parole intervention evaluation summary"), we can assume the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. ***See***

*Commonwealth v. Griffin*, 65 A.3d 932, 937 (Pa. Super. 2013) (citations and internal quotation marks omitted), *appeal denied*, 76 A.3d 538 (Pa. 2013).

Appellant's suggestion that the trial court abused its discretion in imposing a consecutive sentence also does not raise a substantial question. *See Commonwealth v. Caldwell*, 117 A.3d 763, 769 (Pa. Super. 2015) (*en banc*) (stating, "[a] court's exercise of discretion in imposing a sentence concurrently or consecutively does not ordinarily raise a substantial question[.]"), *appeal denied*, 126 A.3d 1282 (Pa. 2015); *see also Commonwealth v. Ahmad*, 961 A.2d 884, 887 n.7 (Pa. Super. 2008); *Commonwealth v. Pass*, 914 A.2d 442, 446-47 (Pa. Super. 2006).

Lastly, we address Appellant's claim that the trial court erred in sentencing her to pay costs without first determining her ability to pay under Pa.R.Crim.P. 706(C). Appellant's Brief at 18-19. We disagree. This Court recently addressed this identical issue in *Commonwealth v. Lopez*, ___ A.3d ___, 2021 PA Super 51, 2021 WL 1096376 (Pa. Super. filed March 23, 2021) (*en banc*), and reaffirmed the precedent that "while a trial court has the discretion to hold an ability-to-pay hearing at sentencing, Rule 706(C) only requires the court to hold such a hearing when a defendant faces incarceration for failure to pay court costs previously imposed on [her]."[7] *Lopez*, 2021 WL

---

[7] Appellant's contention that the holding of *Commonwealth v. Martin*, 335 A.2d 424 (Pa. Super. 1975) (*en banc*), wherein this Court found that a trial
*(Footnote Continued Next Page)*

1096376, *1; *accord Commonwealth v. Childs*, 63 A.3d 323, 326 (Pa. Super 213), *appeal denied*, 70 A.3d 808 (Pa. 2013). Accordingly, we conclude that Rule 706(C) does not require a presentence determination of Appellant's ability to pay before the trial court imposes costs. *Lopez*, *supra*. No relief is due.

In sum, Appellant's claim that sufficient evidence did not support her conviction for aggravated assault because she lacked the necessary *mens rea* of recklessness is without merit. Similarly, she does not obtain relief on her discretionary aspects of sentencing claims. Finally, Appellant's argument that the trial court failed to hold a presentence ability-to-pay determination is contrary to existing precedent.

Judgment of sentence affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/10/21

---

court erred in failing to conduct an ability-to-pay determination before imposing a substantial **fine** as part of a defendant's sentence, be extended to costs was roundly rejected by the *Lopez* Court. *See Lopez*, WL 1096376, *5 (explaining that "a defendant is not entitled to an ability-to-pay hearing before a court imposes courts costs at sentencing.").